USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/14/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

STEVE SANDS,

                                  Plaintiff,                    20-CV-02735 (GBD) (KHP)

       -against-                             **REPORT AND**
                                                         **RECOMMENDATION ON MOTION**
WHAT'S TRENDING, INC.,                            **TO DISMISS**

                                  Defendant.

-----------------------------------------------------------------X

**TO: HON. GEORGE B. DANIELS, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff Steve Sands brings this action against Defendant What's Trending, Inc. ("What's Trending" or "Defendant"), alleging copyright infringement in violation of Section 501 of the Copyright Act, 17 U.S.C. § 101 *et seq.* Plaintiff asserts that What's Trending willfully infringed on his copyright by reproducing and publicly displaying a photograph he took without permission or consent. Now before this Court is Defendant's motion to dismiss Sands' Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons below, I respectfully recommend that Defendant's motion be DENIED.

                                      **Background[1]**

     Sands is a New York-based professional photographer who licenses his photographs to online and print media platforms for a fee. (Am. Compl. ¶¶ 1, 5.) What's Trending is a for-profit entity that owns and operates the website www.WhatsTrending.com. (*Id.* ¶¶ 6-10.)

---

[1] The following facts emanate from Sands' Amended Complaint and the exhibits attached thereto, except where otherwise noted. They are assumed to be true for purposes of this Report and Recommendation.

Sands took a photograph of actor Joaquin Phoenix in his role as the Joker (the "Photograph").  (*Id.* ¶ 11, Ex. A.)  Phoenix played the lead role of the Joker in the 2019 film entitled: "Joker."  *See* https://www.imdb.com/title/tt7286456/ (last visited Dec. 4, 2020).  According to Sands, the Photograph depicts Phoenix live on set during the movie's production.  (Am. Compl. ¶ 15.)  Further, he alleges that he took the Photograph for the purpose of licensing it to media outlets in anticipation of the movie's release (*id.* ¶ 16,) and that he, in fact, made the Photograph available for licensing to commercial news outlets.  (*Id.* ¶ 14.)

On September 17, 2018, What's Trending ran an article on its website entitled, *First Pics of Joaquin Phoenix As The JOKER Released*.  (*Id.* ¶ 19, Ex. C.)  Sands alleges – and it does indeed appear – that the article prominently featured the Photograph.  (*Id.* ¶ 19, Ex. C.)  The article opines that prior iterations of the Joker character in film:

> made The Joker the kind of role that Very Serious Actors want to play . . . now we have an actor whose legend as a great trained master of the cinematic big weirdo acting arts, Joaquin Phoenix, taking the role and the first photos released of the actor hint at just what this movie will be.  The most notable thing about the photos that immediately stands out is that Joaquin Phoenix has forgone the Joker make up in the shots these are from.  Instead we see a . . . long haired creep taking a cigarette into a children's theme park, which certainly feels like something the villainous Joker would do.

(*Id.* Ex. C.)  The article concludes: "what do you think of the first photos of Joaquin Phoenix as the Joker?  Let us know in the comments or on Twitter at @WhatsTrending".  (*Id.*)

What's Trending did not license the Photograph from Sands, nor did it obtain his permission or consent to publish the Photograph on its website.  (*Id.* ¶ 20.)  Sands registered

the Photograph with the U.S. Copyright Office. The Photograph was registered and was given Copyright Registration No. VA 2-121-941, with an effective date of October 4, 2018—a few weeks after What's Trending published the article in question. (*Id.* ¶¶ 18-19.) A registration catalog attached to the Amended Complaint shows that the Photograph was published in September 2018. (*Id.* Ex. B.)[2]

## Procedural History

Sands brought this action on April 1, 2020. (ECF No. 1.) After What's Trending filed its motion to dismiss on July 28, 2020 (ECF No. 16,) Sands filed the Amended Complaint on August 16, 2020. (ECF No. 19.) On August 31, 2020, What's Trending proceeded to file the motion to dismiss the Amended Complaint currently before the Court. (ECF No. 20.) What's Trending primarily argues that that it did not infringe on Sands' copyright because the article featuring the Photograph constitutes fair use under applicable law. The Court assesses the parties' arguments concerning the affirmative defense of fair use, in detail, below.

## Legal Standard

To survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff satisfies this standard if he/she "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In

---

[2] If, after discovery, Defendant can show that the Photograph was not one of the photos listed in Amended Complaint Exhibit B, Defendant may once again move to dismiss this case and may pursue sanctions against Plaintiff's counsel.

3

making this inquiry, the Court must "accept[] all factual allegations as true, but giv[e] no effect to legal conclusions couched as factual allegations." *Stadnick v. Lima*, 861 F.3d 31, 35 (2d Cir. 2017) (internal quotations omitted) (citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010)). Accordingly, the court need not inquire as to whether the plaintiff is likely to prevail on the merits.

## Discussion

Congress codified the fair use doctrine in Section 107 of the Copyright Act. Although copyright holders ordinarily retain exclusive rights to reproduce their work (*see* 17 U.S.C. § 106,) Section 107 permits the unauthorized use or reproduction of a copyrighted work if it is "for purposes such as criticism, comment, news reporting, teaching . . . scholarship, or research." 17 U.S.C. § 107. The statute further directs Courts to consider four factors in determining whether there was fair use of a copyrighted work. They include: "(1) the purpose and character of the use, including whether the use is of a commercial nature or is for non-profit educational uses; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Id.*

These factors are to be analyzed and balanced on a case-by-case basis. *See Blanch v. Koons*, 467 F.3d 244, 251 (2d Cir. 2006) ("the determination of fair use is an open-ended and context-sensitive inquiry"). Ultimately, if the "copyright law's goal of promoting the Progress of Science and useful Arts would be better served by allowing the use than by preventing it," then the use should be permitted. *Castle Rock Entm't, Inc. v. Carol Publ'g Grp.*, 150 F.3d 132, 141 (2d Cir. 1998).

"Fair use is an affirmative defense, and therefore Defendant bears the burden of showing that a given use is fair." *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019) (citing *Authors Guild v. Google, Inc.*, 804 F.3d 202, 213 (2d Cir. 2015)). The Court may properly consider such an affirmative defense at the motion to dismiss stage "where the facts necessary to establish the defense are evident on the face of the complaint." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 308 (2d Cir. 2013) (citing *McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004)). Thus, when the original work and the allegedly infringing version of that work are the only two pieces of evidence needed to decide the question of fair use, as may be the case here, it is appropriate to address that issue while evaluating a motion to dismiss. *Cariou v. Prince*, 714 F.3d 694, 707 (2d Cir. 2013).

I.   **Purpose and Character of the Use**

The essence of the first fair use factor is determining whether the use at issue "supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 579 (1994) (internal citations omitted). To do so, the Court analyzes three sub-factors, which include determining whether the use is (1) transformative, (2) for commercial purposes, or (3) made in bad faith. *Yang*, 405 F. Supp. 3d at 542. "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." *Campbell*, 510 U.S. at 579.

<u>*Defendant's Use of the Photograph Was Not Transformative:*</u>

"[C]opying from an original for the purpose of criticism or commentary on the original or provision of information about it, tends most clearly to satisfy *Campbell*'s notion of the 'transformative' purpose involved in" this analysis. *Authors Guild*, 804 F.3d at 215-16. Accordingly, when a copyrighted image is used to illustrate criticism or commentary or to create a new story about the work, it may very well be transformative. *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 352 (S.D.N.Y. 2017). For instance, "a news report about a video that has gone viral on the Internet might fairly display a screenshot . . . to illustrate what all the fuss is about." *Id.* (Citations omitted). On the contrary, however, "if a photograph is merely used as an illustrative aid that depicts the subjects described in an article, it does not constitute transformative use." *Yang*, 405 F. Supp. 3d at 543 (citing *Barcroft Media, Ltd.*, 297 F. Supp. 3d at 352) (internal quotations and alternations omitted). Indeed, courts have held that it is not fair to "use . . . an image solely to present the content of that image, in a commercial capacity," or to otherwise use it "for the precise reason it was created." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 407 (S.D.N.Y. 2016).

Defendant characterizes its use of the Photograph as part of a news article because the Photograph was published alongside commentary concerning both the contents of the Photograph and what the Photograph might indicate about the plot of the then-upcoming Joker film. Sands opposes this characterization and contends that the use was not transformative, as it merely portrayed the Photograph to show readers its contents—namely, Joaquin Phoenix on set during the filming of Joker. In other words, Sands asserts that there was no transformative effect because What's Trending did nothing more than comment on the subject matter depicted in the Photograph.

6

In support of its argument, Defendant relies heavily on two cases from this District. The first, *Yang v. Mic Network, Inc.*, 405 F. Supp. 3d 537 (S.D.N.Y. 2019), is distinguishable from the case at bar in two important ways. First, in *Yang* the Court assessed the defendant's reproduction of a composite screenshot, which was used to identify a New York Post article that had featured the copyrighted photograph. Thus, the purpose of the secondary use at issue was to identify the controversial Post article, which, of course, was not the original purpose of the copyrighted work featured by that article. *Id.* at 543-44. Second, in *Yang*, the Court found the use at issue transformative because the screenshot that incorporated the copyrighted work portrayed the subject of the photo in a completely different light than originally intended. *See id.* at 544 ("the . . . Article uses the Photograph to place Rochkind in a harshly negative light, while the original use of the Photograph placed him in a positive, or at least neutral light"). In this case, however, the Photograph was not used to identify, let alone criticize, another news source. Nor was it used to portray Phoenix or the film in a different light than initially intended by Sands. Indeed, the Court can reasonably infer that the licensing of the Photograph would be geared towards providing potential viewers with a "sneak peak" into Phoenix's character and/or the plot of the film. *See Barcroft Media, Ltd.*, 297 F. Supp. 3d at 352 ("Paparazzi photographs . . . are designed to document the comings and goings of celebrities, illustrate their fashion and lifestyle choices, and accompany gossip and news articles about their lives). The What's Trending article used the Photograph to do just that. It sought to glean as much information as possible from the Photograph and to interpret the copyrighted work to keep its readers informed.

Similarly, the Court's decision in *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570 (S.D.N.Y. 2020), cited by Defendant, is distinguishable.  There, the plaintiff owned rights to a photograph depicting rapper and celebrity Cardi B at a Tom Ford Fashion show in New York City.  The defendant had published an article featuring an Instagram post published by Cardi B, which happened to incorporate the plaintiff's photograph.  The Court explained that the photograph had initially been taken in order to show the celebrity attending the fashion show and that the defendant did not publish the photograph to make that point.  Instead, the Court found that the photograph was incidentally included in the article because Cardi B's Instagram post featured the photograph; thus, the true purpose of the article was to analyze the fact that Cardi B had disseminated the post, not to present or evaluate the content of the photograph. *Id.* at 581-82.  Conversely, in the case at bar, Defendant used the Photograph to glean information about the filming and plot of "Joker".  Indeed, the article itself states that "the first photos released of the actor hint at just what this movie will be," and that "[t]he most notable thing about the photos . . . is that Joaquin Phoenix has forgone the Joker make up in the shots these are from."  (Am. Compl. Ex. C.)  The article concludes by asking readers to comment about their thoughts on "the first photos of Joaquin Phoenix as the Joker."  (*Id.*)  Thus, the Photograph was the subject of the article, and it would be reasonable to infer that displaying the content of the Photograph was the precise reason the Photograph was created in the first place.

In light of the above, this sub-factor weighs against a finding of fair use, because What's Trending's reproduction of the Photograph was not transformative of the original work.

<u>*Defendant Used the Photograph for Commercial Benefit:*</u>

Sands alleges that What's Trending is a "for-profit entity" that "used the Photograph to illustrate its news article about the then-upcoming release" of the film.  (Am. Compl. ¶¶ 9, 22.)  Thus, Sands has plausibly alleged that What's Trending used the Photograph for commercial purposes, namely (and as its moniker suggests), to provide topical content in order to attract readers.  Defendant essentially concedes this point, choosing instead to focus on the allegedly transformative nature of its use.  (*See* ECF No. 21 ("MOL in Supp.") at 9.)  Accordingly, this sub-factor cuts against a finding of fair use.

<u>What's Trending Did Not Engage in Bad Faith:</u>

As to the third and final sub-factor, I do not find any plausible allegations of Defendant's bad faith in the Amended Complaint or any exhibits thereto.  Plaintiff does not contend otherwise.  While Sands does allege that Defendant reproduced the Photograph without permission or consent, this alone is insufficient to constitute bad faith in this context as a matter of law.  *Blanch*, 467 F.3d at 256 ("we are aware of no controlling authority to the effect that the failure to seek permission for copying, in itself, constitutes bad faith").  Accordingly, this sub-factor weighs in favor of What's Trending's fair use argument.

\*     \*     \*

In sum, two of the three sub-factors concerning the purpose and character of Defendant's use weigh against its proposed affirmative defense.  Thus, I recommend finding that this factor weighs in Sands' favor and cuts against What's Trending's fair use argument.

## II.     *Nature of the Copyrighted Work*

Turning to the next fair use factor, the nature of the copyrighted work, two sub-factors are relevant.  They include: "(1) whether the work is expressive or creative, such as a work of

fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." *Blanch*, 467 F.3d at 256 (citation omitted).  While it is certainly true, as Sands contends, that "photographic images of actual people . . . may be as creative and deserving of protection as purely fanciful creations," *Monster Communs., Inc. v. Turner Broad. Sys.*, 935 F. Supp. 490, 494 (S.D.N.Y. 1996), the pleadings must nevertheless plausibly allege facts that evince "at least a modicum of artfulness, sufficient to designate [the work] a creative (rather than a factual) work." *Yang*, 405 F. Supp. 3d at 546 (internal quotations omitted).

With respect to the first sub-factor, Sands alleges that he exercised his creativity in taking the Photograph, providing as examples his selection of perspective, camera angle, lighting, timing, lens, and filters, which purportedly contribute to the fanciful nature of the Photograph.  (Am. Compl. ¶ 13; ECF No. 23 ("MOL in Opp'n") at 14.)  Further, the What's Trending article describes the Photograph as capturing Phoenix on set and in role as "a slimy, slithery, skinny long haired creep taking a cigarette into a children's theme park, which certainly feels like something the villainous Joker would do."  (Am. Compl. Ex. C.)  Thus, it could be reasonably inferred that the Photograph depicts Phoenix in his "element" as an actor as opposed to capturing him on the street as he naturally appears. *Contra Schwartzwald v. Oath Inc.*, No. 19-cv-9938 (RA), 2020 WL 5441291, at *7 (S.D.N.Y. Sept. 10, 2020) (finding a paparazzi photograph capturing a famous actor on the street "as [he] naturally appeared," without any artful staging of the photograph, to weigh against a finding of fair use).  Thus, although Plaintiff's allegations are certainly not conclusive of this inquiry, it could be reasonably inferred

that the Photograph evinces at least a modicum of artfulness, as opposed to a candid shot of a celebrity walking the sidewalks of New York City.

What's Trending does not cite any case law to support an argument that the Photograph is a factual work. (*See* MOL in Supp. at 9-10.) Although What's Trending argues that its article was a news report, and thus a factual work, the crux of the inquiry is the nature of the *copyrighted work*, not the allegedly infringing secondary use. 17 U.S.C. § 107(2). Accordingly, this sub-factor is neutral or weighs slightly in Sands' favor.

With respect to the second sub-factor, Exhibit B to the Amended Complaint – a public catalog listing some of Sands' copyright registrations – purportedly demonstrates that the Joaquin Phoenix photograph was published in September 2018. (*See* Am. Compl. Ex. B at 5-6.) Sands alleges that What's Trending infringed on his copyright on September 17, 2018. (*Id.* ¶ 19.) Thus, it is not entirely clear whether the Photograph was previously published when Defendant used it. Accordingly, the second sub-factor is neutral concerning the issue of fair use.

In light of the above, drawing all reasonable inferences in Sands' favor, I recommend finding that this factor is neutral or weighs slightly against a finding of fair use. I also note that the nature of the copyrighted work prong "has rarely played a significant role in the determination of a fair use dispute." *Authors Guild*, 804 F.3d at 220.

### III.     *Amount and Substantiality of the Portion of the Copyrighted Work Used*

The third fair use factor, the amount and substantiality of the work used by the alleged infringer, turns on whether the "quantity and value of the materials used[] are reasonable in relation to the purpose of the copying." *Cariou*, 714 F.3d at 710 (alteration in original). Stated

11

another way, a court will consider the proportion of the original work used by the alleged infringer, not how much of the allegedly infringing work was taken from the copyrighted material. *Id.* "The clear implication of the third factor is that a finding of fair use is more likely when small amounts, or less important passages, are copied than when the copying is extensive, or encompasses the most important parts of the original." *Authors Guild*, 804 F.3d at 221.

What's Trending correctly points out that Sands' copyright registration covers 672 photographs and that the allegedly infringing article only features one of those photos. (*See* Am. Compl. Exs. B, C.)  It is also true that a court in this District has held that separate photographs included in a single copyrighted work, such as a brochure, can constitute a single work for purposes of the amount and substantiality analysis.  In *Mathieson v. Associated Press*, No. 90-cv-6945 (LMM), 1992 U.S. Dist. LEXIS 9269 (S.D.N.Y. June 24, 1992), the plaintiff was the creator and copyright owner of numerous photographs contained in a sales brochure.  The fact that the defendant only reproduced two of plaintiff's photographs – both of which appeared on the brochure's cover – cut in favor of a finding of fair use because those two photographs comprised only a small subset of the plaintiff's copyrighted photographs throughout the remainder of the brochure.  *Id.* at *20-21.  In this case, Defendant has provided no authority – and this Court is aware of none – to support Defendant's position that photographs copyrighted collectively as a group similarly constitute a single work for purposes of the fair use analysis. Photographs that are copyrighted as a group are not necessarily related to one another and, in any event, can be licensed to third parties on an individual basis.  More importantly, the What's Trending article reproduced the Photograph in its entirety. (*Compare* Am. Compl. Ex. A, *with*

Am. Compl. Ex. C.)  Accordingly, drawing all reasonable inferences in Sands' favor, I recommend finding that the amount and substantiality of use factor cuts against a finding of fair use.

### IV.     *Effect of the Use Upon the Potential Market for or Value of the Copyrighted Work*

The fourth and final fair use factor is the most important element of the fair use inquiry. *Capitol Records, LLC v. ReDigi Inc.*, 910 F.3d 649, 662 (2d Cir. 2018).  This factor focuses on whether the allegedly infringing use competes with the original in such a way so as to deprive the rights holder of significant revenues because potential purchasers might choose to buy the reproduction as opposed to the original work.  *Fox News Network, LLC v. TVEyes, Inc.*, 883 F.3d 169, 179 (2d Cir. 2018).  The Supreme Court has clarified the scope of the inquiry: "[i]t requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original."  *Campbell*, 510 U.S. at 590 (internal quotation marks omitted).

The Supreme Court in *Campbell* also stated that when an alleged infringer duplicates a copyrighted work in its entirety for commercial purposes, the use presumptively serves as a market replacement for the original and makes cognizable market harm likely.  *Campbell*, 510 U.S. at 591 (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 451 (1984)).  On the other hand, when the second use is deemed transformative, market harm is less likely to take place.  *Campbell*, 510 U.S. at 591.  In an effort to "prevent the loss of licensing fees from becoming a syllogistic consideration, courts consider only the loss to potential licensing revenues from" established, or likely to be established, markets.  *Associated Press v. Meltwater U.S. Holdings, Inc.*, 931 F. Supp. 2d 537, 560 (S.D.N.Y. 2013).

The Court has already recommended finding that What's Trending's allegedly infringing use be deemed non-transformative and for commercial purposes. Accordingly, there is a presumption that Defendant's use would replace Plaintiff's Photograph and adversely impact the market for such photographs if such conduct were left unchecked. *Campbell*, 510 U.S. at 591 (citing *Sony Corp.*, 464 U.S. at 451).

Plaintiff also plausibly alleges that there was market demand for the Photograph given the widespread publicity surrounding the "Joker" movie (Am. Compl. ¶ 17,) and that Plaintiff is in the business of licensing such photographs to online media platforms—the precise commercial space in which What's Trending resides. (Am. Compl. ¶¶ 5, 8, 10.) Thus, by neglecting to pay Plaintiff a licensing fee, What's Trending deprived Sands of revenue he would have otherwise received. Moreover, Defendant's use, if consistently permitted, would destroy the freelance photography market more generally, as Defendant's online media competitors ordinarily do pay licensing fees to use Sands', and other freelancers', photographs. If What's Trending was able to continue avoiding those fees unabated, Sands would struggle to make ends meet as companies would simply use his photographs without permission and without any associated risk of legal liability. There would be no incentive to pay Sands a licensing fee, an outcome contrary to the purposes underlying the Copyright Act.

Defendant argues that its use did not provide a competitive substitute for Sands' work product, relying on the Honorable Vernon S. Broderick's decision in *Walsh* to make this point. However, the allegedly infringing use in *Walsh* was different than the use here. There, the Court reasoned that "because the [p]hotograph did not appear on its own, but as part of [a p]ost, alongside text and another image, it is implausible that Defendant's use would compete

14

with Plaintiff's business or affect the market or value of her work." *Walsh*, 464 F. Supp. 3d at 586.  As discussed above, the defendant in *Walsh* indirectly made use of the copyrighted photograph by reproducing a celebrity's Instagram post that had incorporated the plaintiff's photograph on its own.  Thus, Judge Broderick appropriately reasoned that there was little risk of a prospective licensee circumventing the plaintiff by pursuing the rights to reproduce the Instagram post in its entirety, as opposed to approaching the plaintiff directly.  Anyone who sought to use the plaintiff's picture, which made up only a portion of Cardi B's Instagram post, would be much more likely to engage the plaintiff herself.

In the instant case, the Court need not opine as to the likelihood that a potential licensee would approach What's Trending for permission to use the Photograph, which could certainly destroy the market for the individual Photograph at issue.  *See Cariou*, 714 F.3d at 708 (clarifying the Second Circuit's position that the Court's concern "is not whether the secondary use suppresses or even destroys the market for the original work or its potential derivatives, but whether the secondary use *usurps* the market of the original work") (citing *Blanch*, 467 F.3d at 258) (emphasis in original).  It is far more important that What's Trending reproduced a complete copy of the Photograph for commercial purposes, thereby inhibiting Sands' business as a whole and, as explained in more detail above, usurping the already-existing market of photographers who license their work to online media platforms for a fee.  *Meltwater*, 931 F. Supp. 2d at 561.

Accordingly, drawing all reasonable inferences in Sands' favor, I recommend finding that this factor assessing the effect of the Defendant's use on the potential market for or value of the copyrighted work weighs against a finding of fair use.

## V.     *Overall Assessment*

As described above, with respect to the first factor, I recommend finding that Defendant's use of the Photograph was not transformative, the Photograph was used for commercial purposes, and that there is no plausible allegation of Defendant's bad faith. With respect to the second factor, I recommend finding that the Photograph was neutral or, at most, moderately creative. With respect to the third factor, I recommend finding that Defendant used the entirety of the copyrighted work. And with respect to the fourth factor, I recommend finding that Defendant's use could supplant the market for the Photograph and other similar works. Thus, my recommendation is that, drawing all reasonable inferences in Plaintiff's favor, at least three out of the four fair use factors weigh in Plaintiff's favor, which suggests that Defendant's use was not fair and that the Complaint should not be dismissed on this basis.

## VI.    *Plaintiff's Counsel*

Finally, What's Trending suggests that, in light of Plaintiff's Counsel's well-documented history of professional misconduct, the Complaint should be viewed with skepticism. Specifically, Defendant points out that there is no firm evidence establishing that the group copyright registration encompasses the specific Joaquin Phoenix photograph featured in Defendant's article. Further, Defendant notes that Plaintiff's Counsel has previously made false representations to federal courts claiming copyright protection over unregistered works in an effort to substantiate fraudulent legal claims. (MOL in Supp. at 5.) Accordingly, What's Trending intends to seek discovery on the registration in this case to ensure that it covers the Photograph at issue.

This Court is well aware of Mr. Liebowitz's reputation for misconduct in this District. However, his track record does not alter the Court's legal analysis with respect to the fair use doctrine. Defendant may certainly pursue this proposed discovery and report to the Court if it can be shown that Plaintiff's Counsel has misrepresented any material facts to the Court. However, at this time, such accusations, without proof, are mere conjecture.

## Conclusion

For the foregoing reasons, I respectfully recommend that Defendant's motion to dismiss (ECF No. 20) be DENIED.

Dated: December 14, 2020
New York, New York

Respectfully submitted,

_____
KATHARINE H. PARKER
United States Magistrate Judge

## Notice

**The Defendant shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  See also Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)).  Plaintiff shall also have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.**

**If Defendant files written objections to this Report and Recommendation, the Plaintiff may respond to Defendant's objections within fourteen days after being served with a copy.**

**Fed. R. Civ. P. 72(b)(2). Alternatively, if Plaintiff files written objections, Defendant may respond to such objections within fourteen days after being served with a copy. Fed. R. Civ. P. 72(b)(2);** *see also* **Fed. R. Civ. P. 6(a), (d). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable George B. Daniels at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.** *See* **28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Daniels. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.** *See* **28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b);** *Thomas v. Arn***, 474 U.S. 140 (1985).**